NEW YORK, ONTARIO AND WESTERN RAILWAY COMPANY, Appellant, *v.* CHARLES VICTOR LIVINGSTON, Respondent.

Third Department, November 15, 1923.

Condemnation — railroad company acquired title to land from life tenant through mesne conveyances — railroad erected buildings and converted land into railroad yards — remainderman subsequently procured judgment against railroad company in ejectment that he had legal title to land — railroad company failed to interpose setoff in that action — railroad company cannot condemn land under Condemnation Law and Railroad Law, § 17, free from improvements and must pay for land as it is at time proceeding in condemnation is instituted.

In a proceeding under the Condemnation Law and section 17 of the Railroad Law to condemn certain lands in possession of the plaintiff and on which it had erected a passenger station, freight depot and railroad yards, it appeared that the land in question was originally devised to the defendant's father for life with remainder over to his eldest son; that the life tenant, prior to his marriage, purported to convey the land to plaintiff's predecessor in title; that after the death of the life tenant the defendant brought an ejectment action against the plaintiff and procured a judgment that he had the legal title to the land in question; that the plaintiff herein did not interpose any setoff in the ejectment action to recover the improvements made on the land and that after the entry of that judgment the plaintiff herein commenced this proceeding to condemn the land.

*Held,* that the plaintiff herein cannot set off its claim for improvements in this proceeding and must pay for the land as it was at the time this proceeding was · instituted with the improvements that it had theretofore constructed thereon.

Appeal by the plaintiff, New York, Ontario and Western Railway Company, from an order of the Supreme Court, made at the Albany Special Term and entered in the office of the clerk of the county of Sullivan on the 6th day of February, 1923, confirming the report of the commissioners appointed in a proceeding for the condemnation of real property.

*C. L. Andrus* [*A. T. Clearwater* of counsel], for the appellant.

*Dean, King, Tracy & Smith* [*Howard Chipp* of counsel], for the respondent.

Hinman, J.:

The plaintiff railroad has brought this proceeding under the Condemnation Law for the condemnation of certain lands and premises which are now and for many years past have been in the possession of the said railroad and its predecessor as a portion of its railroad property. The entire property sought to be condemned is a strip of land upwards of 3,200 feet in length and in width varying from 100 to 225 feet within the limits of which are situated the plaintiff's passenger station at Livingston Manor, its freight depot, railroad yards, two main tracks and various side tracks and generally the usual railway equipment incidental to the running and maintenance of a railroad. These structures and equipment cover practically the entire surface of the land involved, which is graded and filled as a railroad. The entire property is essentially a railroad property and nothing else and is maintained as such by the plaintiff as part of its main line for the conduct of its business as a railroad company.

The property involved has been adjudicated by this court to belong to the defendant herein as the result of an action in ejectment brought by the defendant against the plaintiff. (*Livingston v. New York, Ontario & W. R. Co.,* 193 App. Div. 523.)

Edward Livingston at the time of his death in 1864 resided upon a farm of 200 acres in Sullivan county. By his will he gave to his nephew, Charles Octavius Livingston, this farm of 200 acres for his life and upon his decease to the eldest son of said nephew who should then be living. In 1871, at which time the life tenant had not been married, the said life tenant made a deed which purported to convey the farm to one Morss. The predecessor of the plaintiff railroad in 1872 constructed its railroad over said farm under an agreement with Morss for the conveyance of a right of way and in

1880 said Morss by warranty deed conveyed said lands to the plaintiff, the lands thus conveyed comprising the greater part of the lands involved in this proceeding. Subsequently by mesne conveyances from the successors in interest of Morss made in 1890, 1900 and 1910, the balance of the land was acquired by the plaintiff and the plaintiff constructed additional structures and sidings thereon for the use of its railroad. Charles Octavius Livingston, the life tenant, died in 1914, leaving the defendant here as his eldest son. In 1917 the defendant here commenced an action in ejectment against the plaintiff here, which was defended by the railroad company denying the title of the plaintiff therein and alleging title by adverse possession, claiming that the will was void for an unlawful restraint upon the alienation of the real estate devised. The defendant here was successful in that action. It was held that where a railroad company having a power to exercise the right of eminent domain instead of doing so bought the premises in reliance upon the title of the grantee of a life tenant, who had covenanted that his descendants should forever be estopped and barred from claiming title, such railroad company acquired no title as against the remainderman. It was held that if a railroad company having the power of eminent domain chose to deal with one who had only the rights of a life tenant, it could not be heard to urge an estoppel against the remainderman for at the bottom of an estoppel lies either fraud or something which operates as such, and the remainderman could not be said to have acted fraudulently by remaining quiet until his rights in the premises had become vested by the death of the life tenant. It was held that as the defendant had constructive notice of the remainderman's rights, its entry upon the premises was wrongful as to him and not adverse.

After the entry of judgment in the ejectment suit which held Livingston, the defendant here, to be the absolute owner of the property, this condemnation proceeding was instituted. The plaintiff railroad company characterizes the proceeding as one to cure the title which it had attempted to acquire through the life tenant and which had been found to be invalid as to the remainderman. The plaintiff relies upon section 17 of the Railroad Law* which gives to a railroad corporation the right to acquire, by condemnation, lands necessary for such railroad and contains this provision: "And it shall also have the right of condemnation in the following additional cases: 1. Where title to real property has been acquired, or attempted to be acquired, and has been found to be invalid or defective." The claim of the railroad company is that

---

* Amd. by Laws of 1913, chap. 284.— [REP.

this additional power of condemnation was intended to apply to a case where a different rule of damages should apply than in a proceeding to acquire lands *de novo*. The statute does not so indicate, however, and we cannot import it. There are no rules in the statute providing different standards of compensation adaptable to different classes of circumstances. The specific contention of the plaintiff is that a corporation having the power of eminent domain is not required in condemnation proceedings to pay the owner of land sought to be condemned for the value of structures erected upon the land by it while lawfully in possession. That proposition, however, finds no support in the statute relied upon. The right to acquire this property after judgment against the railroad in the ejectment action does not by necessary implication of the statute include the right to eliminate from the award the value of the improvements made by the railroad. The ordinary measure of compensation is the actual value of what is acquired at the time of the taking in condemnation. At the time of this taking the judgment in ejectment had found that the railroad never had any title as against the defendant Livingston. This court said in that case: " The defendant, with constructive notice of the rights of the plaintiff, entered into possession of the premises as it now contends adversely. Such entry was wrongful, and it had not the excuse of necessity, for it at all times had the power of eminent domain, and could have condemned and paid for the property which it desired." (*Livingston* v. *New York, Ontario & W. R. Co., supra,* 529.) Such entry was wrongful from the outset as to this remainderman. A waste was committed, contrary to the rights of this remainderman, in the conversion of farm lands into railroad lands and upon the death of the life tenant the railroad became a trespasser and has continued to be such ever since. The judgment in ejectment declared that Livingston was the absolute owner of the lands and premises, which included the structures erected upon the lands. Upon what basis in law or equity can the railroad now claim the right to condemn the lands apart from the structures, when it must pay for what it acquires at the time? It is taking the property of the defendant just as much when it acquires the structures as when it takes the lands. If that is not the effect of the judgment, upon what theory could the situation be otherwise?

A review of the authorities and text writers as to the allowance for improvements by a *bona fide* occupant under a claim of title, where such occupant subsequently condemns the property occupied to acquire title or to cure a defective one, appears to present some difficulties when an attempt is made to apply the rules which have been formulated to the situation disclosed in the present controversy.

Considering the history of the rule as to the allowance for improvements generally these seeming difficulties disappear. If controversies relating to allowance for improvements were to be decided on abstract principles of justice, it would seem that ordinarily where an occupier of land, claiming under color of title, in good faith, makes permanent improvements on the land enhancing its value, he should be allowed for the improvements where he is deprived of possession by the true owner. Such a rule, however, applied generally conflicts with all common-law notions of the ownership of property which are founded on the idea that where a person intermeddles with property, real or personal, he does so at his peril. Although he is not bound to know that it belongs to another, he is bound to know whether it belongs to himself. So it follows that where an owner of property resorts to a common-law court to recover possession by an action in ejectment, he recovers his property with all the improvements permanently affixed to the land and no allowance is made by way of damages or lien upon the land for the value of the improvements or the enhanced value of the lands so improved except by way of setoff to damages for mesne profits. Under the early common law, real actions, strictly so called, were for the specific recovery of lands, no damages being allowed either for the unlawful withholding or by way of setoff for improvements. (Roscoe Real Actions, 1.) A real action did not accomplish complete justice to the owner as he recovered no damages for the unlawful taking and withholding of the land. To recover such damages the owner was compelled to resort to the personal action of trespass *quare clausum fregit.* Ejectment was evolved from this action of trespass and real actions with all their delays and complexities were abandoned. Ejectment thus became the common method of trying titles, the issue of title being the real subject of the controversy and the damages recoverable, although originally the purpose of the trespass action, became merely nominal. (3 Black. Comm. 205.) So ejectment took the place of real actions although of a mixed nature, and where substantial damages were claimed by the plaintiff in ejectment, his remedy was an action of trespass for mesne profits after a recovery in ejectment, whereupon the judgment in ejectment became evidence of the title. (Roscoe Real Actions, 705.) From the nature of the remedies of the legal owner at common law and his correlative rights, it appears that there were no means whereby an occupant not having legal title but in good faith making improvements on the land could recover for the same by way of setoff or lien against the land in ejectment. If, in the circumstances of the case, he had a just claim for such

38

improvements his only method of asserting it was in the action for mesne profits by way of setoff and in such case the common-law courts allowed the damages to be so diminished. The common-law rule allowing the setoff in the action for mesne profits was adopted in this State and prior to the Revised Statutes the method of recovery was substantially as here outlined. (*Jackson* v. *Loomis*, 4 Cow. 168; *Van Alen* v. *Rogers*, 1 Johns. Cas. 281; *Jackson* v. *Combs*, 7 Cow. 36.) By the Revised Statutes substantial changes were made in the procedure in ejectment. It was provided by section 44 *et seq.* of title 1 of chapter 5 of part 3 of the Revised Statutes (2 R. S. 310, 311) that instead of the action of trespass for mesne profits as theretofore used, the plaintiff, seeking to recover such profits as damages, might within a year after the docketing of the judgment in ejectment make and file a " suggestion " for such claim, whereupon the ejectment action would in effect be continued. It was further provided that on the trial of the claim for mesne profits, the defendant should have the right to set off permanent improvements to the amount of plaintiff's claim " as is now allowed by law." Later the procedure was again changed but the general rule as to setoff has been continued to the present time. Section 1011 of the Civil Practice Act provides: " In an action for the recovery of real property or the possession thereof, the plaintiff, where he recovers judgment for the property, or possession of the property, is entitled to recover as damages the rents and profits, or the value of the use and occupation, of the real property recovered, for a term not exceeding six years; but the damages shall not include the value of the use of any improvements made by the defendant or those under whom he claims. Where permanent improvements have been made in good faith by the defendant or those under whom he claims, while holding, under color of title, adversely to the plaintiff, the value thereof must be allowed to the defendant in reduction of the damages of the plaintiff, but not beyond the amount of those damages."

It, therefore, appears on principle that where an owner of land has a legal title sufficient to sustain an action of ejectment there can be no recovery for improvements by the occupier except by way of setoff to damages for mesne profits. The present legislative definition of the ancient technical term " mesne profits " is " the rents and profits, or the value of the use and occupation, of the real property recovered." The action for mesne profits under the common law was a liberal and equitable one and allowed of every kind of equitable defense. (*Wallace* v. *Berdell*, 101 N. Y. 13.) This equitable setoff was the limit of recovery where the owner of the legal title sustained his action of ejectment at common law.

This result necessarily follows by reason of the nature of the remedies administered at common law.

In an equitable action, however, the rule was different. The Court of Chancery administering a different system of remedies and being untrammeled by the strict rules of the common law afforded a greater allowance to an occupier in some cases where he made valuable improvements in good faith, he being the holder of the legal title but being liable to be dispossessed at the suit of the equitable owner. In this respect the Court of Equity followed the rule of the civil law which permitted the possessor of property of another to have payment for improvements after deducting from the value thereof a fair compensation for the rents or use of the property during the time he occupied it, where such possessor had erected buildings or made other improvements on the lands in good faith supposing himself to be the owner. (2 Am. Jur. 294.) In determining, therefore, the right to compensation for improvements the first inquiry is whether they were made by the legal or equitable owner. If made by the legal owner of lands to which another is equitably entitled, the latter when he resorts to a court of equity to enforce his equitable rights, will ordinarily be required to do equity by reimbursing the legal owner for the enhanced value of the lands by reason of permanent improvements made thereon by the person occupying under defective legal title provided the occupier made the improvements in good faith. But where the legal owner has title sufficient to enable him to pursue his rights and recover the property at law by ejectment, the occupier cannot recover for improvements beyond the mesne profits. In *Putnam* v. *Ritchie* (6 Paige, 390, 404) the chancellor in discussing the right to an allowance for permanent improvements said: " This principle of natural equity is constantly acted upon in this court where the legal title is in the person who has made the improvements in good faith, and where the equitable title is in another who is obliged to resort to this court for relief. The court in such cases acts upon the principle that the party who comes here as a complainant, to ask equity, must himself be willing to do what is equitable. I have not, however, been able to find any case, either in this country or in England, wherein the Court of Chancery has assumed jurisdiction to give relief to a complainant who has made improvements upon land the legal title to which was in the defendant, where there has been neither fraud nor acquiescence on the part of the latter after he had knowledge of his legal rights. I do not, therefore, feel myself authorized to introduce a new principle into the law of this court, without the sanction of the Legislature, which principle in its application to future cases might be productive of more injury

than benefit. If it is desirable that such a principle should be introduced into the law of this State, for the purpose of giving the *bona fide* possessor a lien upon the legal title for the beneficial improvements he has made, it would probably be much better to give him a remedy by action at law, where both parties could have the benefit of a trial by jury, than to embarrass the title to real estate with the expense and delay of a protracted chancery suit in all such cases."

This is the rule which has been followed in this State. (*Mickles* v. *Dillaye,* 17 N. Y. 80; *Bedell* v. *Shaw,* 59 id. 46; *Woodhull* v. *Rosenthal,* 61 id. 383; *Wood* v. *Wood,* 83 id. 575; *Satterlee* v. *Kobbe,* 173 id. 91; *Thomas* v. *Evans,* 105 id. 612; *Trimm* v. *Marsh,* 54 id. 599; *Dows* v. *Congdon,* 28 id. 122; *Wallace* v. *Berdell,* 101 id. 13.)

In the case at bar defendant here prior to the condemnation proceedings pursued his remedy at common law in ejectment and was successful. It was not necessary for him to come into equity for any purpose. Since he obtained a judgment at law upon his legal title and the railroad company in the ejectment suit failed to set off its claim for improvements, it cannot do it now. The fact that an occupier of land has the right of eminent domain gives it the right to take the property upon making compensation. What a railroad corporation takes it must pay for as the rights and interests of the parties exist at the time of the taking. The railroad is now taking lands and structures which have been held to be the absolute property of the defendant. Assuming that the railroad company at the time the ejectment action was brought, might have brought an action in equity staying the ejectment action and asking that the railroad company obtain some relief with relation to the improvements made by it upon the ground of fraud or acquiescence upon the part of the remainderman, the fact is that the railroad company did not do so. Moreover, it would seem that the railroad would not have been successful in so urging an estoppel against the remainderman since this court has already said as much in the ejectment suit. Woodward, J., in the case of *Livingston* v. *New York, Ontario & W. R. Co.* (*supra,* at p. 528) said: " The public records at all times showed that the title to this property must vest eventually in one other than the life tenant, and if the defendant, possessed of the right of eminent domain, chose to deal with one who had only the rights of the life tenant it cannot now be heard to urge an estoppel, for at the bottom of an estoppel lies either fraud, or something which operates as such (*Wilmore* v. *Flack,* 96 N. Y. 512, 520), and the plaintiff cannot be said to have acted fraudulently by remaining quiet until his rights in the premises had become fixed."

We are unable to find any basis in law or equity which would permit the railroad now to claim the right to condemn the lands apart from the structures.

The appellant, relying upon what was said in *Matter of City of New York* (198 N. Y. 84, 89) in relation to the decision in *Village of St. Johnsville* v. *Smith* (184 id. 341), maintains that the structures being solely adapted to railroad purposes, the lands were not proved to have been enhanced in value thereby, that there was no evidence to show that they added anything to the value of the defendant's land as a farm. In the *St. Johnsville* case the property condemned was a portion of a farm and the structures erected by the village upon a portion only of the farm did not change the character of the property as a whole. It remained a farm and the structures were not adapted to a farm, adding little or nothing to its value as such. In the present case the property acquired has no relation to a farm and for the major part has had no such relation for fifty years. Nor is it a part of any property differing from it in character. It has been railroad property and nothing else for all that time. It is unreasonable to consider the question of the adaptability of the structures to the land as of the situation existing fifty years ago when the railroad entered upon the lands as part of a farm. For many years the narrow strip of land sought to be acquired has constituted a railroad right of way through a large village. During all this time the land has not been adapted to farming purposes but peculiarly to railroad purposes. The defendant is entitled to a consideration of this peculiar adaptability for the purposes for which the land is being taken in fixing the value of the land (*Matter of N. Y., Westchester & Boston R. Co.*, 151 App. Div. 50, 56; *Matter of N. Y., L. & W. R. Co.*, 27 Hun, 116; *Van Size* v. *Long Island R. R. Co.*, 3 id. 613; *Matter of Gilroy*, 85 id. 424) and is entitled to the value of the structures if they are adaptable to and enhance the value of the land for the purposes of the condemnor. (*Matter of City of New York*, 198 N. Y. 84.) The commissioners have viewed the land and premises and have fixed apparently moderate values well within the figures presented by the witnesses both as to the land and the structures and the measure of compensation adopted seems to be fully sustained by authority. (*Matter of City of New York*, 198 N. Y. 84.)

The order appealed from should be affirmed, with costs.

COCHRANE, P. J., H. T. KELLOGG and VAN KIRK, JJ., concur; HASBROUCK, J., not sitting.

Final order unanimously affirmed, with costs.